# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | | |
|---|---|---|
| ANDREW BARRETT, on behalf of himself and others similarly situated, | : | Case No. 2:15-cv-01348 |
| Plaintiff, | : | |
| v. | : | **JURY DEMANDED** |
| THE ADT CORPORATION (f/k/a ADT Security Services, Inc.) | : | |
| Defendant. | : | |

## CLASS ACTION COMPLAINT

### Preliminary Statement

1. Since at least 2007, Defendant The ADT Corporation ("ADT") has been targeted repeatedly by private and government enforcement actions alleging that its Authorized Dealers generate business for ADT through unscrupulous telemarketing practices that violate the federal Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227 *et seq.*

2. In fact, in 2012, while it was defending a nationwide class action lawsuit brought under the TCPA and eventually settled for $15 million, ADT learned that one longtime Authorized Dealer, Security Solutions, Inc. ("SSI"), was using illegal prerecorded-message telemarketing to generate new ADT customers. ADT did nothing to stop SSI's illegal conduct and failed even to investigate the allegations.

3. That same year, ADT was sued four times for SSI's illegal telemarketing and also learned SSI was using an unapproved vendor to place telemarketing calls.

4. Even though ADT had the contractual authority to fine, suspend, terminate, or audit SSI for these infractions—and even though ADT was preparing to pay millions to settle similar allegations—ADT took no action against SSI.

5. Instead of invoking its authority to stop SSI's illegal telemarketing, ADT rewarded SSI by paying it more than $2.5 million in 2012 alone.

6. ADT's inaction allowed SSI's illegal telemarketing to continue unabated, and at a staggering pace. In just a six-month span in 2013 alone, SSI placed over ***13.8 million*** ADT promotional calls using illegal prerecorded messages generated through its Philippines-based telemarketing call center.

7. Plaintiff Andrew Barrett is one of the many consumers who received these illegal calls. He brings this putative class action lawsuit to enforce the consumer-privacy provisions of the TCPA and achieve redress and compensation for affected consumers. In a case in which individual damages are set by statute at $500-$1,500 per violation, a class action is the best if not the only means of obtaining redress for the wide scale illegal telemarketing and is consistent both with the private right of action afforded by the TCPA and the fairness and efficiency goals of Rule 23 of the Federal Rules of Civil Procedure.

**Parties**

8. Plaintiff Andrew Barrett is a resident of this state.

9. Defendant The ADT Corporation (f/k/a ADT Security Services, Inc.) is a corporation traded on the New York Stock Exchange under the symbol "ADT." It is headquartered in Boca Raton, FL.

**Jurisdiction & Venue**

10. The Court has federal question subject matter jurisdiction over these TCPA claims. *Mims v. Arrow Fin. Servs., LLC*, 132 S. Ct. 740 (2012).

11. Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because Plaintiff is a resident of this district, which is where he received the illegal telemarketing call that is the subject of this putative class action lawsuit.

**The Telephone Consumer Protection Act**

12. In 1991, Congress enacted the TCPA to regulate the explosive growth of the telemarketing industry. In so doing, Congress recognized that "[u]nrestricted telemarketing . . . can be an intrusive invasion of privacy[.]" Pub. L. No. 102-243, § 2(5) (1991) (codified at 47 U.S.C. § 227).

13. The TCPA's most severe restrictions address prerecorded telemarketing calls. In enacting the statute, Congress stated that banning these calls was "the only effective means of protecting telephone consumers from this nuisance and privacy invasion." *Id.* § 2(10) and (12); *see also Mims*, 132 S. Ct. at 745.

14. Accordingly, the TCPA prohibits persons from initiating telemarketing calls to residential telephone lines using a prerecorded voice to deliver a message without the prior express consent of the called party. 47 U.S.C. § 227(b)(1)(B); *see also* 47 C.F.R. § 64.1200(a)(2).

15. For prerecorded telemarketing calls made to cell and landlines after October 16, 2013, the telemarketer must show prior express consent through a signed writing (a) bearing the signature of the person providing consent; (b) that specifies the telephone number to which the person consenting is called; (c) clearly authorizes the company to call the person using an auto dialer or prerecorded message for telemarketing purposes; and (d) providing consent is not a condition of purchasing goods or services. *See in the Matter of Rules and Regulations*

*Implementing the Telephone Consumer Protection Act of 1991*, 27 FCC Rccd. 1830, 1844 ¶33 (2012).

16. Under the TCPA, a seller of a product or service may be vicariously liable for a third-party marketer's violations of Section 227(b), even if the seller did not physically dial the illegal call, and even if the seller did not directly control the marketer who did. *In re Joint Pet. filed by Dish Network, LLC*, FCC 13-54 ¶ 37, 2013 WL 193449 (May 9, 2013) ("FCC Ruling").

17. A seller is liable under Section 227(b) when it has authorized a telemarketer to market its goods or services. *Id.* ¶ 47.

18. Additionally, a seller may be vicariously liable for a Section 227(b) violation under principles of apparent authority and ratification. *Id.* ¶ 46.

19. The May 2013 FCC Ruling further held that, even in the absence of evidence of a formal contractual relationship between the seller and the telemarketer, a seller is liable for telemarketing calls if the telemarketer "has apparent (if not actual) authority" to make the calls. *Id.* ¶ 34.

20. Under the facts pled below, and through the development of additional facts through discovery, ADT is vicariously liable for the SSI telemarketing calls at issue in this case.

## Factual Allegations

**A.  ADT sells through authorized dealers subject to its control.**

21. ADT sells security services through 300 Authorized Dealers, approximately 40 of which ADT authorizes to telemarket.

22. ADT claims it trains and monitors its Authorized Dealers to ensure that they use sound and ethical business practices, and that it provides dealers with a full range of services to assist in all aspects of their business.

4

23. ADT has the right to discipline and terminate Authorized Dealers that engage in illegal telemarketing but failed to exercise that right with respect to SSI.

24. Under ADT's Dealer Agreement with SSI and other Authorized Dealers:

   a. The dealer must exclusively advertise, market, and promote ADT security services to potential customers, and could use ADT's trademark, trade name, and intellectual property in its marketing.

   b. The dealer must comply with guidelines that ADT retained the sole right to modify.

   c. ADT could investigate and resolve consumer complaints against the dealer and offset costs by deducting payments to it.

   d. ADT could fine or terminate the dealer for any violation of its guidelines, including its telemarketing guidelines.

25. ADT authorized SSI to use telemarketing when it issued an "ADT Authorized Dealer Certification of Telemarketing Compliance."

26. ADT had the right to discipline and terminate SSI for violating ADT's Telemarketing Guidelines, which obligated SSI to maintain and produce records of its outbound telemarketing campaigns. SSI failed to do so, and ADT failed to demand that SSI do so.

27. ADT maintained a secure website for its dealers, including SSI, to enter new customer information and to help Authorized Dealers manage their business, communicate with ADT, share customer leads, submit financial reports, run credit checks on potential customers, obtain marketing materials, and provide confidential and proprietary information.

28. When signing up new customers, ADT required Authorized Dealers to use ADT-created contracts displaying the ADT logo.

29. ADT also provided Authorized Dealers with yard signs and window stickers with the ADT logo.

**B. ADT has been targeted by public and private TCPA enforcement actions since at least 2007.**

30. In 2007, the FTC sued ADT and two Authorized Dealers for illegal telemarketing in federal district court in Florida.

31. In 2007, ADT agreed to resolve the case through a consent decree requiring it:

   a. To investigate to ensure that its authorized dealers had established and enforced telemarketing policies and procedures;

   b. To have a written contract with authorized dealers engaged in telemarketing on ADT's behalf that required telemarketing compliance;

   c. To monitor dealers' outbound telemarketing campaigns; and

   d. To cease doing business with an authorized dealer after learning it was engaged in telemarketing in violation of federal law.

32. Despite the consent decree, consumers continue to receive illegal telemarketing calls promoting ADT.

33. In 2011, a nationwide class action lawsuit was filed against ADT alleging that its Authorized Dealers violated TCPA provisions governing prerecorded telemarketing and telemarketing to consumers on the Do Not Call Registry. *See Desai v. ADT Sec. Servs., Inc.*, No.11-1925, Dkt. No. 247 (N.D. Ill. June 21, 2013).

34. ADT settled the case for $15 million in 2013 and agreed to implement new policies to ensure TCPA compliance.

**C. ADT long knew that SSI was using prerecorded message telemarketing.**

   **1. In early 2012, ADT knew SSI used unapproved marketing companies to place telemarketing calls but took no action.**

35. On February 23, 2012—more than a year-and-a-half before the call to Plaintiff—a consumer named Mark Fitzhenry brought a *pro se* action in South Carolina against ADT and SSI alleging violations of the TCPA's prerecorded message provisions.

36. After ADT was served with the complaint, ADT Telemarketing Compliance Coordinator Ron Frantz asked SSI to explain the Fitzhenry call.

37. SSI owner Christopher Pitman admitted to Mr. Frantz that the call was placed for SSI by a third-party marketing company that SSI had "tested" in January of 2012.

38. Although ADT corporate policy purportedly required that SSI obtain approval to use third-party marketing companies, SSI did not seek ADT's approval, and ADT did not discipline SSI for its failure or follow up in any manner in response to Mr. Pitman's disclosure that SSI was using an unapproved third party telemarketing vendor.

### 2. On August 24, 2012, ADT again learned SSI was using illegal prerecorded messages but failed to take action.

39. On August 24, 2012, ADT received an email from one of Plaintiff's counsel, who at the time was negotiating a settlement with ADT in *Desai*, to advise that a consumer named Jay Connor had received an illegal prerecorded telemarketing call from SSI.

40. Attached to the email was an audio recording of the SSI call to Mr. Connor.

41. The recording demonstrated that SSI was using prerecorded messages in its telemarketing.

42. Although ADT had been sued by Mr. Fitzhenry for SSI's illegal telemarketing just six months earlier, ADT (a) did not investigate these new allegations; (b) did not contact SSI about the allegations; (c) did not inform its TCPA compliance department of them; (d) ordered no audit of SSI's telemarketing practices; (e) requested no records or other information from SSI; and (f) took no disciplinary action against SSI relating to the allegations.

43. Until he gave a deposition approximately two years later, Mr. Pitman had never even seen the August 24, 2012 email.

7

**3. In the fall of 2012, ADT was sued three more times for SSI's prerecorded-message telemarketing but failed to take action against SSI to stop the violations.**

44. Several months later, in November of 2012, class counsel wrote to ADT, again, to inform it that Mr. Connor had sued ADT and SSI in August in South Carolina.

45. Mr. Connor received yet another illegal telemarketing call from SSI and filed another lawsuit against ADT and SSI in October 2012.

46. In response to the two Connor lawsuits, ADT ordered no audit of SSI's telemarketing practices and took no disciplinary action against SSI whatsoever.

47. On November 15, 2012, ADT was again sued in federal court in Florida for SSI's illegal prerecorded voice telemarketing.

48. In response, ADT ordered no audit of SSI, asked to review no documentation, and did not discipline, sanction, or warn SSI.

**4. Despite its knowledge of SSI's illegal telemarketing, ADT rewarded SSI with $2.5 million for generating new business for ADT in 2012, imposed no fines, and took no disciplinary action—but instead reauthorized SSI to use telemarketing to sell ADT services.**

49. Despite four lawsuits alleging illegal prerecorded marketing by SSI, ADT (a) ordered no compliance audit; (b) never warned it against future telemarketing violations; and (c) never required SSI to complete training regarding TCPA compliance.

50. Instead, in 2012, ADT paid SSI $2.5 million for generating new ADT customers through its telemarketing and imposed no fine or discipline.

51. And, despite SSI's history of telemarketing lawsuits, on March 25, 2013, ADT re-approved SSI as an ADT Authorized Dealer authorized to telemarket.

52. In July 2013, ADT emailed all 300 of its dealers informing them that it had amended its Telemarketing Guidelines to prohibit them from telemarketing using prerecorded messages.

53. Other than sending this email, ADT took no action to ensure that SSI complied with the Guidelines.

54. SSI owner Mr. Pitman stated he "probably received" the Guidelines but had no conversations with ADT regarding them.

55. Although ADT frequently held webinars and in-person sales trainings for its Authorized Dealers, ADT never trained SSI regarding telemarketing compliance.

56. ADT invited Pitman to company events such as a dealer convention in Florida and a 2013 celebrity pro-am golf tournament in Nevada but never provided telemarketing training, and Pitman had no telephone or in-person meetings with ADT representatives regarding telemarketing.

57. From 2010 to 2013, ADT paid SSI approximately $7 million for obtaining new ADT customers through telemarketing.

**D.    Plaintiff received an SSI prerecorded telemarketing message on his cell phone.**

58. On September 12, 2013, Plaintiff received a prerecorded telemarketing call on his cell phone, telephone number 614-571-XXXX.

59. The call was placed by or for SSI to sell ADT alarm systems and monitoring services.

60. On the call, Plaintiff attempted to identify himself but was cut off by a prerecorded voice.

61. The prerecorded voice identified itself as "Katie" and stated that she was calling from "Home Protection."

62. After Plaintiff responded, a significant delay occurred before informing him that the calling party was looking for an advertising home in his area.

63. Plaintiff responded to the recorded voice that he was not interested, and the call terminated.

E. **The technology used to place Plaintiff's call used a prerecorded voice to deliver a message and was used to send 13.7 million calls in six months.**

64. Plaintiff's call originated from a call center in the Philippines and was placed using automated technology developed by a company called Perfect Pitch.

65. The Perfect Pitch technology allows a sales agent to carry on multiple "conversations" simultaneously, using computer keystrokes to play prerecorded snippets of audio recordings intended to respond to the call recipients' statements and questions.

66. Call records show that from June to December of 2013, the Philippine call centers made over 13.8 million calls for SSI using the Perfect Pitch technology. Of these calls, over five million were completed and connected to call recipients, including the call to Plaintiff.

67. Recordings of the calls reveal the awkwardness, annoyance, and even absurdity of the prerecorded responses generated through the Perfect Pitch technology.

68. For example, one call included the following "conversation":

Recipient: Now what's it gonna cost to use it?

Recording: Well a lot of people I talk to actually think this is too good to be true but we really do give you an $850 home security system for free. Now all I'm asking is for a couple minutes of your time to find out more about it then you can decide for yourself if it's a good fit for you and your family.

| | Recipient: | What's it going to cost to be hooked in to the [inaudible as Shelby Prerecord plays over response]. |
|---|---|---|
| | Recording: | [Begins playing over question from Call Recipient] Okay so I just need to verify that you do own the home that you're living in, is that correct? |

69. Another call included this "conversation":

| | Recording: | We're looking for an advertising home in your area, would you be interested in receiving a free wireless home security system in exchange for putting a small security sign in your yard? |
|---|---|---|
| | Recipient: | No ma'am. |
| | Recording: | Well I do understand, what I can do for you so that you don't miss out on this limited time offer is just to transfer you over to a specialist who can explain all the details to you then you can decide for yourself if it's a good fit for you and your family. Is that ok? |

70. And another:

| | Recording: | We're looking for an advertising home in your area, would you be interested in receiving a free wireless home security system in exchange for putting a small security sign in your yard? |
|---|---|---|
| | Recipient: | What company are you with? |
| | Recording: | Could you repeat that? |
| | Recipient: | What company are you with? |
| | Recording: | Home protection. |
| | Recipient: | Home protection, ok, will there be sensors put around anywhere or what does that entail? |
| | Recording: | Well I do understand, what I can do for you so that you don't miss out on this limited time offer is just to transfer you over to a specialist who can explain all the details to you then you can decide for yourself if it's a good fit for you and your family. Is that ok? |
| | Recipient: | That'd be good. |
| | Recording: | Ok so I just need to verify that you do own the home that you're living in, is that correct? |

11

| | | |
|---|---|---|
| Recipient: | Correct. | |

[Approximately 5 second pause]

Recording: Again I just need to verify that you do own the home that you're living in, is that right?

Recipient: That's correct.

Recording: Ok well my job is just to make sure you are interested in learning more, I have a specialist standing by to explain all the details then you can decide if this is a good fit for you and your family. I just need to ask do you currently have a home security system?

Recipient: Not as such.

[Approximately 5 second pause]

Recording: Do you currently have a home security system?

Recipient: A dog is all I have.

[Approximately 5 second pause]

Recording: Ok sorry I'm having a little trouble hearing you could you say that one more time.

Recipient: Our only home security we have right now is a dog. D-O-G, dog.

Recording: [Starts playing over Call Recipient] Ok. Ok great one second while my associate comes on the line.

71. Additionally, numerous calls include "conversations" with the squealing tone of a fax machine or with an answering machine.

**Class Action Allegations**

72. As authorized by Rule 23 of the Federal Rules of Civil Procedure, Plaintiff brings this action on behalf of a class of all other persons or entities similarly situated throughout the United States.

73. The class of persons Plaintiff proposes to represent is tentatively defined, subject to modification after discovery and case development:

> All persons within the State of Ohio who, from June 3, 2013 through December 30, 2013, (a) received a telemarketing call, (b) from or at the direction of Security Solutions, (c) for the purpose of promoting ADT services, and (d) that was initiated using a prerecorded voice message.

74. Class members are identifiable through telephone call logs that show the time and date of each call, the number dialed, and include recordings of every call.

75. There are thousands of class members. Individual joinder of each is impracticable.

76. There are questions of law and fact common to Plaintiff and to the proposed class, including but not limited to the following:

   a. Did the telemarketing calls use a prerecorded voice? This question, to the extent it is subject to factual dispute at all, can be answered efficiently through scientific analysis of the recordings of calls to class members.

   b. Do calls using a prerecorded voice violate 47 U.S.C. § 227(b)(1)(B), which provides, "It shall be unlawful for any person . . . to initiate any telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party"? This question can be answered by applying the factual analysis regarding the call recordings to the straightforward legal standard under the statute.

   c. Is ADT vicariously liable for the telemarketing calls to class members? This question focuses on the relationships and dealings between Security Solutions and ADT, and not on issues relating to individual class members.

   d. Should class members recover statutory damages of $500 per violation of § 227(b)(1)(B)? These damages are set by statute and require no individualized analysis of harm.

77. Plaintiff is an adequate representative of the class because his interests do not conflict with class member interests, he will fairly and adequately protect class member interests, and he is represented by counsel skilled and experienced in class actions, including TCPA class actions.

78. Common questions of law and fact predominate over questions affecting only individual class members.

79. A class action is the superior method for fair and efficient adjudication of the controversy because:

   a. The likelihood that individual class members will prosecute separate actions is remote due to the time and expense necessary to prosecute an individual case;

   b. The interest of the class members in individually pursuing claims against the Defendant is slight because the statutory damages for an individual action are relatively small, and are therefore not likely to deter the Defendant from engaging in the same behavior in the future.

80. Defendant has acted on grounds generally applicable to the class, thereby making final injunctive relief and corresponding declaratory relief with respect to the class as a whole appropriate.

**Claims for Relief**

**First Count:**

**Knowing and/or Willful Violations of the TCPA**

81. Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully stated herein.

82. The acts and omissions of the Defendant constitute numerous and multiple knowing and/or willful violations of the TCPA, including but not limited to each of the above-cited provisions of 47 U.S.C. § 227 *et seq.*

83. As a result of the Defendant's knowing and/or willful violations of 47 U.S.C. § 227 *et seq.*, Plaintiffs and each member of the class is entitled to treble damages of up to $1,500 for each and every call in violation of the statute.

84. Plaintiff and all class members are also entitled to and do seek injunctive relief prohibiting such conduct violating the TCPA by the Defendant in the future.

**Second Count:**

**Negligent Violations of the TCPA**

85. Plaintiff incorporates by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

86. The acts and omissions of the Defendant constitute numerous and multiple violations of the TCPA, including but not limited to each of the above cited provisions of 47 U.S.C. § 227 *et seq.*

87. As a result of the Defendant's violations of 47 U.S.C. § 227 *et seq.*, Plaintiff and class members are entitled to an award of $500 in statutory damages for each and every call in violation of the statute.

88. Plaintiff and class members are also entitled to and do seek injunctive relief prohibiting the Defendant's violation of the TCPA in the future.

**Relief Sought**

For himself and all class members, Plaintiff requests the following relief:

1. That Defendant be restrained from engaging in future telemarketing in violation of the TCPA.

2. That Defendant, and its agents, or anyone acting on its behalf, be immediately restrained from altering, deleting, or destroying any documents or records that could be used to identify class members.

3. That the Court certify the claims of the named Plaintiff and all other persons similarly situated as class action claims under Rule 23 of the Federal Rules of Civil Procedure.

4. That Plaintiff and all class members be awarded statutory damages of $500 for each negligent violation of the TCPA and $1,500 for each knowing violation.

5. That Plaintiff and all class members be granted other relief as is just and equitable under the circumstances.

**Plaintiff requests a jury trial as to all claims of the complaint so triable.**

Respectfully submitted,

**/s/ Brian K. Murphy**
Brian K. Murphy, Trial Attorney (0070654)
Murray Murphy Moul + Basil LLP
1114 Dublin Road
Columbus, OH 43215
(614) 488-0400
(614) 488-0401 *facsimile*
E-mail: murphy@mmmb.com

John W. Barrett
Bailey & Glasser, LLP
209 Capitol Street
Charleston, WV 25301
(304) 345-6555
E-mail: jbarrett@baileyglasser.com
*Subject to Pro Hac Vice*

Edward A. Broderick
Anthony I. Paronich
Broderick Law, P.C.
99 High Street, Suite 304
Boston, MA 02110
(617) 738-7080
(617) 830-0327 *facsimile*
Email: ted@broderick-law.com
      anthony@broderick-law.com
*Subject to Pro Hac Vice*

Matthew P. McCue
The Law Office of Matthew P. McCue
1 South Avenue, Suite 3
Natick, MA 01760
(508) 655-1415
(508) 319-3077 *facsimile*
E-mail: mmccue@massattorneys.net
*Subject to Pro Hac Vice*

Alexander E. Burke
Burke Law Offices, LLC
155 N. Michigan Ave., Suite 9020
Chicago, IL 60601
(312) 729-5288
E-mail: ABurke@BurkeLawLLC.com
*Subject to Pro Hac Vice*

*Attorneys for Plaintiff*